**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: _____

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY, and GEICO
CASUALTY CO.,

                Plaintiffs,

    -v-

ADRIAN SAGMAN, D.C., ADRIAN SAGMAN,
D.C., P.A. d/b/a MIRAMAR MEDICAL CENTER,
and DORSAL REHAB, INC.,

                Defendants.

_____/

**Jury Trial Demand**

## COMPLAINT

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue the Defendants and allege as follows:

1. This action seeks to recover more than $1,250,000.00 that the Defendants wrongfully obtained from GEICO by submitting thousands of fraudulent and unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants Adrian Sagman, D.C., P.A. d/b/a Miramar Medical Center ("Miramar Medical") and Dorsal Rehab, Inc. ("Dorsal Rehab")(collectively, the "Sagman Entities"), relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including putative patient examinations, physical therapy services, and chiropractic services (collectively, the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims who were eligible for coverage under GEICO no-fault insurance policies ("Insureds").

1

2.  As set forth more fully herein, the Defendants were never entitled to receive payment on the PIP insurance claims that they submitted to Plaintiffs, because:

(i)  at all relevant times, the Defendants operated in violation of Florida law, including Florida's Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"), Florida's Patient Self-Referral Act, Fla. Stat. § 456.053 (the "Self-Referral Act"), and Florida's Physical Therapy Practice Act, Fla. Stat. § 486.011-486.172 ("the Physical Therapy Act");

(ii)  the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly received the Fraudulent Services;

(iii)  in many cases, the Fraudulent Services were never legitimately provided in the first instance;

(iv)  the Defendants' billing for the Fraudulent Services misrepresented the nature, extent, results, and medical necessity of the Fraudulent Services, in order to fraudulently inflate the charges submitted to GEICO;

(v)  the Defendants unlawfully billed GEICO for "physical therapy" services performed by massage therapists and unlicensed/unsupervised individuals; and

(vi)  the Defendants' billing for the Fraudulent Services misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and was submitted in violation of the billing requirements set forth in the Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

3.  As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO the Sagman Entities.

4.  The Defendants at all relevant times have known that they were not entitled to receive payment on the PIP insurance claims that they submitted to Plaintiffs because of the fraudulent and unlawful activities described herein.

2

5.      The charts annexed hereto as Exhibits "1" – "2" set forth large, representative samples of the fraudulent claims that have been identified to date that the Defendants have submitted through the Sagman Entities to GEICO by mail.

6.      The Defendants' fraudulent and unlawful scheme began no later than 2020 and has continued uninterrupted since that time. As a result of the Defendants' fraudulent and unlawful scheme, GEICO has incurred damages of more than $1,250,000.00.

<b><u>THE PARTIES</u></b>

**I.      <u>Plaintiffs</u>**

7.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

**II.     <u>Defendants</u>**

8.      Defendant Adrian Sagman, D.C. ("Sagman") resides in and is a citizen of Florida. Sagman was licensed to practice chiropractic in Florida on or about August 19, 2002, owned and controlled the Sagman Entities, used the Sagman Entities as vehicles to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers, and purported to perform Fraudulent Services on behalf of the Sagman Entities.

9.      Defendant Miramar Medical is a Florida professional corporation with its principal place of business in Miramar, Florida, and is owned and controlled by Sagman. Miramar was incorporated in Florida on or about July 8, 2004, and was used as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP insurance billing to GEICO and other insurers.

10.     Defendant Dorsal Rehab is a Florida corporation with its principal place of business in Miramar, Florida, and is owned and controlled by Sagman. Dorsal Rehab was incorporated in Florida on or around January 3, 2005, and was used as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP insurance billing to GEICO and other insurers.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

12.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

13.     Additionally, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

14.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

**I.      Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

15.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is set forth in the No-Fault Law, which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to insureds.

4

16.     Under the No-Fault Law, an insured can assign their right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company using the required claim forms – including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form") – in order to receive payment for medically necessary services.

17.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for "medically necessary" services. At the same time, health care services providers are only eligible to receive PIP Benefits for medically necessary services.

18.     Pursuant to the No-Fault Law, "medically necessary" means:

[A] medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a)     In accordance with generally accepted standards of medical practice;

(b)     Clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c)     Not primarily for the convenience of the patient, physician, or other health care provider.

19.     In order for a health care service to be eligible for PIP reimbursement, it not only must be medically necessary, but also must be "lawfully" provided.

20.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

21.     Thus, health care services providers may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal,

5

civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

22.     Pursuant to the Clinic Act, a license issued by the Florida Agency for Health Care Administration (the "AHCA") is required in order to operate a clinic in Florida. The Clinic Act defines "clinic" to mean: "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

23.     However, the Clinic Act provides an exemption from the clinic licensing requirements for:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws. However, a health care practitioner may not supervise services beyond the scope of the practitioner's license. . . .

24.     Therefore, in order for a health care practice to qualify for the "wholly owned" exemption under the Clinic Act, a health care practice not only must be "wholly owned" by licensed health care practitioners (or licensed health care practitioners together with immediate family members), but at least one licensed practitioner-owner must legitimately supervise the business activities of the practice and remain legally responsible for the practice's compliance with all federal and state laws.

25.     A health care practice that does not qualify for the "wholly owned" exemption, and that does not otherwise have a clinic license, operates unlawfully under Florida law.

26.     Thus, pursuant to both the No-Fault Law and the Clinic Act, health care practices that operate in violation of the Clinic Act's licensing or other operating requirements are not

entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

27.     Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving – or failing to make a good-faith effort to collect – co-payments or deductibles from patients with PIP insurance.

28.     Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

29.     Further, subject to certain exceptions that are inapplicable in this case, Florida's Self-Referral Act prohibits chiropractors from self-referring patients for health care services to entities in which the referring chiropractors are investors or have an investment interest.

30.     The Self-Referral Act also provides that:

Any health care provider or other entity that enters into an arrangement or scheme, such as a cross-referral arrangement, which the physician or entity knows or should know has a principal purpose of assuring referrals by the physician to a particular entity which, if the physician directly made referrals to such entity, would be in violation of this section, shall be subject to a civil penalty of not more than $100,000 for each such circumvention arrangement or scheme to be imposed and collected by the appropriate board.

31.     Pursuant to the Self-Referral Act, health care providers may not submit any claim for payment to any insurer for services rendered pursuant to an unlawful self-referral.

32.     What is more, health care providers that collect payments for services rendered pursuant to unlawful self-referrals must "refund such amount on a timely basis."

33.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers to collect PIP Benefits for massage therapy and for services performed by massage therapists.

34.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for any services provided by massage therapists.

35.     Pursuant to the Physical Therapy Act: (i) massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy; and (ii) unlicensed and unsupervised individuals may not practice physical therapy or hold themselves out as being able to practice physical therapy.

36.     Pursuant to the Physical Therapy Act and the No-Fault Law, insurers such as GEICO are not required to pay for any services performed by massage therapists or for physical therapy services that are unlawfully performed by unlicensed and unsupervised individuals.

37.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)     for any service or treatment that is "upcoded", meaning that the service or treatment is billed using a billing code that would result in payment greater in amount than would be paid by using a billing code that accurately describes the service or treatment performed;

(ii)    to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii)   with respect to a bill or statement that does not substantially meet the billing requirements as set forth in the No-Fault Law.

38.      The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare and Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes that are used to bill for health care services.

39.     In turn, the instructions promulgated by CMS for the completion of HCFA-1500 forms require, among other things, that all HCFA-1500 forms set forth – in Box 31 – the identity

of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

40.     To "directly supervise" a service, a supervising health care practitioner "must be present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed."

41.     Additionally, pursuant to the No-Fault Law, in order for a health care service to be eligible for PIP reimbursement, the applicable HCFA-1500 claim form must set forth the professional license number of the provider who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials".

42.     Insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual health care practitioners who performed or directly supervised the underlying services.

## II.     The Defendants' Fraudulent and Unlawful Scheme

43.     Since at least 2020, and continuing through the present day, the Defendants conceived and implemented a fraudulent scheme in which they billed GEICO and other Florida automobile insurers millions of dollars for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services.

## A.     The Unlawful Billing for Services Performed by Massage Therapists and Unlicensed/Unsupervised Individuals, and the Misrepresentations Regarding the Identities of the Actual Treating Practitioners

44.     The Defendants' fraudulent and unlawful schemes included the submission of billing through the Sagman Entities for purported "physical therapy" services.

9

45. In the claims identified in Exhibits "1" – "2", the purported "physical therapy" services were unlawfully performed – to the extent they were performed at all – by massage therapists, including individuals named Janet Ilbert, L.M.T. ("Ilbert"), Marcelo Ferreyra, L.M.T. ("Ferrerya"), and Silvio Ferrer, L.M.T. ("Ferrer").

46. Ilbert was employed by or associated with the Sagman Entities, and purported to perform many of the Fraudulent Services on behalf of the Sagman Entities.

47. Ferrerya was employed by or associated with the Sagman Entities, and purported to perform many of the Fraudulent Services on behalf of the Sagman Entities.

48. Ferrer was employed by or associated with Dorsal Rehab, and purported to perform many of the Fraudulent Services on behalf of the Sagman Entities.

49. The Defendants were aware of the fact that they could not lawfully recover PIP Benefits for physical therapy services performed by massage therapists or unsupervised/unlicensed individuals.

50. As a result, and in order to conceal the fact that Ilbert, Ferrerya, Ferrer, and other massage therapists and unsupervised/unlicensed individuals performed the purported physical therapy services that were unlawfully billed through the Sagman Entities to GEICO, the Defendants deliberately omitted any reference to Ilbert, Ferrerya, Ferrer, and other massage therapists and unlicensed/unsupervised individuals associated with the Sagman Entities on the HCFA-1500 forms that they used to bill for putative physical therapy services.

51. Instead, in the claims for physical therapy services identified in Exhibits "1" – "2", the Sagman Entities and Sagman routinely and falsely listed Sagman in Box 31 of the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

10

52.     In fact, Sagman did not legitimately perform or directly supervise the physical therapy services in the claims identified in Exhibits "1" – "2", and could not have legitimately performed or directly supervised the physical therapy services.

53.     For example:

(i)      On January 2, 2020, Sagman purported to personally perform – or at least directly supervise – at least 22.25 hours of services that were provided to at least 11 different Insureds at Miramar Medical and Dorsal Rehab.

(ii)     On February 20, 2020, Sagman purported to personally perform – or at least directly supervise – at least 21 hours of services that were provided to at least 11 different Insureds at Miramar Medical and Dorsal Rehab.

(iii)    On February 1, 2021, Sagman purported to personally perform – or at least directly supervise – at least 19.5 hours of services that were provided to at least nine different Insureds at Miramar Medical and Dorsal Rehab.

(iv)     On April 30, 2021, Sagman purported to personally perform – or at least directly supervise – at least 21 hours of services that were provided to at least 11 different Insureds at Miramar Medical and Dorsal Rehab.

(v)      On September 27, 2021, Sagman purported to personally perform – or at least directly supervise – at least 20 hours of services that were provided to at least 13 different Insureds at Miramar Medical and Dorsal Rehab.

(vi)     On October 5, 2021, Sagman purported to personally perform – or at least directly supervise – at least 22 hours of services that were provided to at least 14 different Insureds at Miramar Medical and Dorsal Rehab.

(vii)    On October 27, 2021, Sagman purported to personally perform – or at least directly supervise – at least 21 hours of services that were provided to at least 14 different Insureds at Miramar Medical and Dorsal Rehab.

(viii)   On January 12, 2022, Sagman purported to personally perform – or at least directly supervise – at least 18 hours of services that were provided to at least eight different Insureds at Miramar Medical and Dorsal Rehab.

(ix)     On April 27, 2022, Sagman purported to personally perform – or at least directly supervise – at least 18 hours of services that were provided to at least 10 different Insureds at Miramar Medical and Dorsal Rehab.

(x)      On February 2, 2023, Sagman purported to personally perform – or at least directly supervise – at least 21 hours of services that were provided to at least 10 different

Insureds at Miramar Medical and Dorsal Rehab.

(xi)    On March 1, 2023, Sagman purported to personally – or at least directly supervise – at least 18.5 hours of services that were provided to at least 10 different Insureds at Miramar Medical and Dorsal Rehab.

(xii)   On March 22, 2023, Sagman purported to personally perform – or at least directly supervise – at least 19.5 hours of services that were provided to at least nine different Insureds at Miramar Medical and Dorsal Rehab.

(xiii)  On April 5, 2023, Sagman purported to personally perform – or at least directly supervise – at least 19.75 hours of services that were provided to at least 10 different Insureds at Miramar Medical and Dorsal Rehab.

(xiv)   On May 10, 2023, Sagman purported to personally perform – or at least directly supervise – at least 19 hours of services that were provided to at least nine different Insureds at Miramar Medical and Dorsal Rehab.

(xv)    On May 17, 2023, Sagman purported to personally perform – or at least directly supervise – at least 19.5 hours of services that were provided to at least 10 different Insureds at Miramar Medical and Dorsal Rehab.

54.     These are only representative examples. In the claims for physical therapy services that are identified in Exhibits "1" – "2", the Defendants routinely falsely represented that Sagman had performed – or at least directly supervised – a non-credible number of physical therapy services on individual dates.

55.     Furthermore, upon information and belief, the fraudulent and unlawful billing for physical therapy services and related services that the Defendants submitted through the Sagman Entities to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that they submitted to all of the automobile insurers in the Florida automobile insurance market.

56.     GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

12

57. It is improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing through the Sagman Entities to GEICO and that they did not simultaneously bill other automobile insurers.

58. Thus, upon information and belief, the non-credible number of physical therapy services and related services that Sagman purported to perform or directly supervise for GEICO Insureds at the Sagman Entities on individual dates of service – including but not limited to the dates of service identified above – constituted only a fraction of the total number of physical therapy services that Sagman purported to perform or directly supervise on those same dates of service.

59. In the claims for "physical therapy" services identified in Exhibits "1" – "2" the Defendants routinely falsely misrepresented that the physical therapy services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i) the purported physical therapy services were performed – to the extent that they were performed at all – by massage therapists and unsupervised/unlicensed individuals, in contravention of Florida law;

(ii) the Sagman Entities could not lawfully recover PIP Benefits for the purported physical therapy services, because the services were performed by massage therapists and unsupervised/unlicensed individuals, and because the clinics operated in violation of Florida law; and

(iii) the Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative physical therapy services.

**B.    The Violations of the Self-Referral Act**

60. The Defendants' scheme was aimed at generating as much PIP billing as possible, per Insured, which in turn required them to provide large amounts of medically unnecessary

13

Fraudulent Services to each Insured, regardless of whether the Insureds needed the Fraudulent Services.

61.     However, the Defendants knew that, if they billed for all of their Fraudulent Services through a single entity or practice, under a single tax identification number, it could draw attention to their fraudulent and unlawful PIP billing scheme.

62.     Accordingly, the Defendants caused Miramar Medical and Dorsal Rehab to be formed as separate entities, with different names and tax identification numbers, and then divided their billing for the Fraudulent Services across the two separate entities, in order to reduce the volume of billing submitted through any one entity, and thereby conceal and perpetuate their fraudulent PIP billing scheme.

63.     To facilitate their scheme, the Defendants engaged in patterns of unlawful self-referrals between and among Miramar Medical and Dorsal Rehab.

**1.     The Unlawful Self-Referrals from Miramar Medical to Dorsal Rehab for Physical Therapy Services**

64.     For instance, the Self-Referral Act prohibits any health care provider from referring patients for certain "designated health care services" to any entity in which the health care provider is an investor or has an investment interest.

65.     In the context of the Self-Referral Act, Sagman – as a licensed chiropractor – was a "health care provider".

66.     In the context of the Self-Referral Act, the putative physical therapy services that Dorsal Rehab purported to provide were "designated health care services".

67.     As a result, Sagman could not lawfully self-refer Insureds from Miramar Medical to Dorsal Rehab for physical therapy services.

14

68.     Even so, in the claims identified in Exhibits "1" – "2", Sagman routinely and unlawfully self-referred Insureds from Miramar Medical to Dorsal Rehab for purported physical therapy services.

69.     For example:

(i)     On or about November 16, 2020, Sagman caused an Insured named BL to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(ii)    On or about July 21, 2020, Sagman caused an Insured named FR to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(iii)   On or about August 4, 2020, Sagman caused an Insured named IS to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(iv)    On or about February 1, 2021, Sagman caused an Insured named LV to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(v)     On or about September 20, 2021, Sagman caused an Insured named JM to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(vi)    On or about September 20, 2021, Sagman caused an Insured named JG to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(vii)   On or about January 28, 2022, Sagman caused an Insured named MR to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and

15

then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(viii)   On or about March 14, 2022, Sagman caused an Insured named MA to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(ix)   On or about April 29, 2022, Sagman caused an Insured named DG to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(x)   On or about July 12, 2022, Sagman caused an Insured named DG to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(xi)   On or about January 12, 2023, Sagman caused an Insured named JD to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(xii)   On or about February 8, 2023, Sagman caused an Insured named JM to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(xiii)   On or about October 9, 2023, Sagman caused an Insured named MT to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(xiv)   On or about November 7, 2023, Sagman caused an Insured named BA to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(xv)    On or about December 26, 2023, Sagman caused an Insured named FS to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(xvi)   On or about April 11, 2024, Sagman caused an Insured named TC to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(xvii)  On or about July 31, 2024, Sagman caused an Insured named KL to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(xviii) On or about September 6, 2024, Sagman caused an Insured named MF to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(xix)   On or about January 14, 2025, Sagman caused an Insured named SM to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

(xx)    On or about March 17, 2025, Sagman caused an Insured named EM to be self-referred from Miramar Medical to Dorsal Rehab for physical therapy services, and then caused Dorsal Rehab to bill GEICO for the physical therapy services, which were provided – to the extent that they were provided at all – pursuant to an unlawful self-referral.

70.    These are only representative examples. In the claims identified in Exhibits "1" – "2", Sagman routinely and unlawfully self-referred Insureds from Miramar Medical to Dorsal Rehab for purported physical therapy services.

71.    In the claims identified Exhibit "2", Sagman and Dorsal Rehab routinely falsely represented that the physical therapy services were lawfully provided and reimbursable, when in

fact they were provided – to the extent that they were provided at all – pursuant to the Defendants' unlawful self-referral scheme, and therefore were not entitled to PIP reimbursement.

**C.    The Defendants' Fraudulent Treatment and Billing Protocols**

72.    In the claims identified in Exhibits "1" - "2", almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced.

73.    Even so, in the claims identified in Exhibits "1" - "2", the Defendants purported to subject almost every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to this "treatment".

74.    The Defendants purported to provide their pre-determined fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" - "2" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any actual continuing medical problems arising from any actual automobile accidents.

75.    Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

76.    No legitimate physician, chiropractor, clinic, or other health care provider would permit the fraudulent treatment and billing protocols described below to proceed under their auspices.

77.     The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices they sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

**1.     The Fraudulent and Unlawful Charges for Initial Examinations at Miramar Medical**

78.     As an initial step in the Defendants' fraudulent treatment and billing protocols, Sagman and Miramar Medical purported to provide many of the Insureds in the claims identified in Exhibit "1" with an initial examination, with Sagman purporting to personally perform or directly supervise the initial examinations.

79.     As set forth in Exhibit "1", Miramar Medical and Sagman typically billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99204, typically resulting in a charge of $350.00 for each initial examination that they purported to provide.

80.     In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented Miramar Medical's eligibility to collect PIP Benefits in the first instance.

81.     In fact, and as set forth herein, Miramar Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of Florida law.

82.     As set forth below, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations, and whether they were legitimately performed in the first place.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

83.     As set forth herein, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of CPT codes.

19

84. The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

85. Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination typically represents that the patient presented for the examination with problems of moderate to high severity.

86. The CPT Assistant provides various clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99204 to bill for an initial patient examination:

(i) Office visit for initial evaluation of a 63-year-old male with chest pain on on exertion. (Cardiology/Internal Medicine)

(ii) Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii) Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv) Initial office visit for a 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v) Initial office visit for a 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi) Initial office evaluation of a 70-year-old female with polyarthralgia. (Rheumatology)

(vii) Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

87. Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99204 to bill for an initial examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

88.     By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their typically-minor automobile accidents, the problems almost always were minimal severity soft tissue injuries such as sprains and strains.

89.     For instance, in most of the claims identified in Exhibit "1", the Insureds did not seek treatment at any hospital as the result of their accidents. To the limited extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis, and discharged with nothing more serious than a minor soft tissue injury diagnosis.

90.     Furthermore, in most of the claims identified in Exhibit "1", contemporaneous police reports indicated that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the accidents, or injured at all.

91.     Even so, in the claims for initial examinations identified in Exhibit "1", Miramar Medical and Sagman billed GEICO for the putative initial examinations using CPT code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity. In fact, the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems as the result of any automobile accidents at all at the time of the purported examinations.

92.     For example:

(i)     On July 28, 2020, an Insured named IS was involved in an automobile accident. The contemporaneous police report indicated that IS's vehicle was drivable following the accident. The police report further indicated that IS was not injured as the result of the accident. In keeping with the fact that IS was not seriously injured, IS did not visit any hospital emergency room following the accident. To the extent that IS experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of IS by Sagman on August 4, 2020, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

21

(ii)     On November 30, 2020, an Insured named ML was involved in an automobile accident. The contemporaneous police report indicated that ML's vehicle was drivable following the accident. The police report further indicated that ML was not injured as the result of the accident. In keeping with the fact that ML was not seriously injured, ML did not visit any hospital emergency room following the accident. To the extent that ML experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of ML by Sagman on December 9, 2020, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(iii)    On December 15, 2020, an Insured named KB was involved in an automobile accident. The contemporaneous police report indicated that KB's vehicle was drivable following the accident. The police report further indicated that KB was not injured as the result of the accident. In keeping with the fact that KB was not seriously injured, KB did not visit any hospital emergency room following the accident. To the extent that KB experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of KB by Sagman on December 28, 2020, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(iv)     On May 14, 2021, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured as the result of the accident. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of MM by Sagman on May 19, 2021, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(v)      On July 10, 2021, an Insured named NB was involved in an automobile accident. The contemporaneous police report indicated that NB's vehicle was drivable following the accident. The police report further indicated that NB was not injured as the result of the accident. In keeping with the fact that NB was not seriously injured, NB did not visit any hospital emergency room following the accident. To the extent that NB experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of NB by Sagman on July 13, 2021, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(vi)     On January 6, 2022, an Insured named FD was involved in an automobile accident. The contemporaneous police report indicated that FD's vehicle was drivable following the accident. The police report further indicated that FD was not injured as the result of the accident. In keeping with the fact that FD was not seriously injured, FD did not visit any hospital emergency room following the accident. To the extent that FD experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of FD by Sagman on January 14, 2022, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(vii)    On January 12, 2022, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that JD's vehicle was drivable following the accident. The police report further indicated that JD was not injured as the result of the accident. In keeping with the fact that JD was not seriously injured, JD did not visit any hospital emergency room following the accident. To the extent that JD experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of JD by Sagman on January 14, 2022, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(viii)   On April 10, 2022, an Insured named TE was involved in an automobile accident. The contemporaneous police report indicated that TE's vehicle was drivable following the accident. The police report further indicated that TE was not injured as the result of the accident. In keeping with the fact that TE was not seriously injured, TE did not visit any hospital emergency room following the accident. To the extent that TE experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of TE by Sagman on April 18, 2022, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(ix)     On December 19, 2023, an Insured named BG was involved in an automobile accident. The contemporaneous police report indicated that BG's vehicle was drivable following the accident. The police report further indicated that BG was not injured as the result of the accident. In keeping with the fact that BG was not seriously injured, BG did not visit any hospital emergency room following the accident. To the extent that BG experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of BG by Sagman on January 2, 2024, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

23

(x)      On February 25, 2024, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that JS's vehicle was drivable following the accident. The police report further indicated that JS was not injured as the result of the accident. In keeping with the fact that JS was not seriously injured, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of JS by Sagman on February 27, 2024, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(xi)      On February 29, 2024, an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured as the result of the accident. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of JH by Sagman on March 4, 2024, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(xii)     On August 22, 2024, an Insured named RD was involved in an automobile accident. The contemporaneous police report indicated that RD's vehicle was drivable following the accident. The police report further indicated that RD was not injured as the result of the accident. In keeping with the fact that RD was not seriously injured, RD did not visit any hospital emergency room following the accident. To the extent that RD experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of RD by Sagman on August 22, 2024, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(xiii)    On October 24, 2024, an Insured named GH was involved in an automobile accident. The contemporaneous police report indicated that GH's vehicle was drivable following the accident. The police report further indicated that GH was not injured as the result of the accident. In keeping with the fact that GH was not seriously injured, GH did not visit any hospital emergency room following the accident. To the extent that GH experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of GH by Sagman on October 31, 2024, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely

represented that the examination involved presenting problems of moderate to high severity.

(xiv)   On January 5, 2025, an Insured named KD was involved in an automobile accident. The contemporaneous police report indicated that KD's vehicle was drivable following the accident. The police report further indicated that KD was not injured as the result of the accident. In keeping with the fact that KD was not seriously injured, KD did not visit any hospital emergency room following the accident. To the extent that KD experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of KD by Sagman on January 14, 2025, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

(xv)   On January 9, 2025, an Insured named SM was involved in an automobile accident. The contemporaneous police report indicated that SM's vehicle was drivable following the accident. The police report further indicated that SM was not injured as the result of the accident. In keeping with the fact that SM was not seriously injured, SM did not visit any hospital emergency room following the accident. To the extent that SM experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of SM by Sagman on January 14, 2025, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved presenting problems of moderate to high severity.

93.   These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Miramar Medical and Sagman routinely and falsely represented that the Insureds presented with problems of moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

94.     What is more, in the claims identified in Exhibit "1", the charges for the initial examinations under CPT code 99204 misrepresented and exaggerated the amount of time that the examining health care practitioner – namely Sagman – spent providing the examinations.

95.     Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the physician or other health care practitioner who performed the underlying examination spent at least 45 minutes of time performing the examination.

96.     As set forth in Exhibit "1", Miramar Medical and Sagman submitted the substantial majority of their billing for initial examinations under CPT code 99204, and thereby represented that Sagman spent at least 45 minutes of time performing the putative examinations.

97.     In fact, in the claims for initial examinations identified in Exhibit "1", neither Sagman, nor any other health care practitioner associated with Miramar Medical including, but not limited to, chiropractors, chiropractic assistants, and massage therapists, at the direction of Sagman, spent even 15 minutes of time performing the examinations, much less 45 minutes.

98.     For instance, and in keeping with the fact that the initial examinations allegedly provided through Miramar Medical did not take more than 15 minutes of time to perform, the purported examinations included a very limited range of parameters, consisting of brief patient interviews and a limited examination of the Insureds' musculoskeletal systems.

99.     These brief interviews and limited examinations did not require Sagman, or any other health care practitioner associated with Miramar Medical, to spend more than 15 minutes performing the purported examinations.

100.    Moreover, the purported initial examinations in the claims identified in Exhibit "1" were not legitimately performed at all, inasmuch as the outcomes of the putative examinations

were pre-determined to result in false soft tissue injury diagnoses and medically unnecessary treatment recommendations, regardless of the Insureds' actual individual circumstances and presentation.

101.    In the claims for initial examinations identified in Exhibit "1", Miramar Medical and Sagman routinely falsely routinely misrepresented the amount of time that was spent conducting the initial examinations because lengthier examinations that are billable under CPT code 99204 are reimbursable at a higher rate than examinations that require less time to perform.

**c.      Misrepresentations Regarding the Extent of Medical Decision-Making**

102.    Pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in connection with an initial patient examination, namely straightforward, low complexity, moderate complexity, and high complexity medical decision-making.

103.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

104.    Pursuant to the CPT Assistant, the use of CPT code 92204 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

27

105.    For an initial patient examination to legitimately entail "moderate complexity" medical decision-making, the examination typically must, among other things, involve: (i) chronic illness, acute illness with systematic symptoms or complications, or an undiagnosed problem with an uncertain prognosis; (ii) the review and analysis of a larger amount of the patient's medical records/history than would be required to satisfy "low complexity" medical decision-making; and (iii) at least a moderate risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

106.    As set forth in Exhibit "1", Miramar Medical and Sagman submitted the substantial majority of their billing for initial examinations under CPT code 99204, and thereby represented that Sagman engaged in legitimate "moderate complexity" medical decision-making in connection with the examinations.

107.    In fact, and to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their typically minor automobile accidents, the problems almost always were minor soft tissue injuries such as sprains and strains.

108.    The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate moderate complexity medical decision-making.

109.    In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

110.    Rather, in the claims for initial examinations identified in Exhibit "1": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at

all; and (iii) Miramar Medical and Sagman did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations, and provided substantially similar, false, objectively unverifiable soft tissue injury "diagnoses" for almost every Insured, regardless of their true individual circumstances or presentation.

111.     For example:

(i)      On December 2, 2020, an Insured named AV was involved in an automobile accident. The contemporaneous police report indicated that AV's vehicle was drivable following the accident. The police report further indicated that AV was not injured and did not complain of any pain at the scene. In keeping with the fact that AV was not seriously injured, AV did not visit any hospital emergency room following the accident. To the extent that AV experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on December 8, 2020, Sagman purported to conduct an initial examination of AV at Miramar Medical. To the extent that Sagman performed the examination in the first instance, he did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sagman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sagman provided AV substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither AV's presenting problems, nor the treatment plan provided to AV by Sagman presented any risk of significant complications, morbidity, or mortality. To the contrary, AV did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sagman consisted of medically unnecessary chiropractic/physical therapy treatment, which did not pose the least bit of risk to AV. Even so, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sagman engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)     On May 14, 2021, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured as the result of the accident. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on May 19, 2021, Sagman purported to conduct an initial examination of MM at Miramar Medical. To the extent that Sagman performed the examination in the first instance, he did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sagman did not

29

consider any significant number of diagnoses or management options in connection with the examination. Instead, Sagman provided MM with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither MM's presenting problems, nor the treatment plan provided to MM by Sagman presented any risk of significant complications, morbidity, or mortality. To the contrary, MM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sagman consisted of medically unnecessary chiropractic/physical therapy treatment, which did not pose the least bit of risk to MM. Even so, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sagman engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)     On January 6, 2022, an Insured named FD was involved in an automobile accident. The contemporaneous police report indicated that FD's vehicle was drivable following the accident. The police report further indicated that FD was not injured as the result of the accident. In keeping with the fact that FD was not seriously injured, FD did not visit any hospital emergency room following the accident. To the extent that FD experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on January 14, 2022, Sagman purported to conduct an initial examination of FD at Miramar Medical. To the extent that Sagman performed the examination in the first instance, he did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sagman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sagman provided FD with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither FD's presenting problems, nor the treatment plan provided to FD by Sagman presented any risk of significant complications, morbidity, or mortality. To the contrary, FD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sagman consisted of medically unnecessary chiropractic/physical therapy treatment, which did not pose the least bit of risk to FD. Even so, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sagman engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)     On January 6, 2022, an Insured named TE was involved in an automobile accident. The contemporaneous police report indicated that TE's vehicle was drivable following the accident. The police report further indicated that TE was not injured as the result of the accident. In keeping with the fact that TE was not seriously injured, TE did not visit any hospital emergency room following the accident. To the extent that TE experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on April 18, 2022, Sagman purported to conduct an initial examination of TE at Miramar Medical. To the extent that Sagman performed the examination in the first instance, he did not retrieve, review,

or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sagman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sagman provided TE with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither TE's presenting problems, nor the treatment plan provided to TE by Sagman presented any risk of significant complications, morbidity, or mortality. To the contrary, TE did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sagman consisted of medically unnecessary chiropractic/physical therapy treatment, which did not pose the least bit of risk to TE. Even so, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sagman engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)     On August 14, 2022, an Insured named CW was involved in an automobile accident. The contemporaneous police report indicated that CW's vehicle was drivable following the accident. The police report further indicated that CW was not injured and did not complain of any pain at the scene. In keeping with the fact that CW was not seriously injured, CW did not visit any hospital emergency room following the accident. To the extent that CW experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on August 17, 2022, Sagman purported to conduct an initial examination of CW at Miramar Medical. To the extent that Sagman performed the examination in the first instance, he did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sagman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sagman provided CW substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither CW's presenting problems, nor the treatment plan provided to CW by Sagman presented any risk of significant complications, morbidity, or mortality. To the contrary, CW did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sagman consisted of medically unnecessary chiropractic/physical therapy treatment, which did not pose the least bit of risk to CW. Even so, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sagman engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)    On August 10, 2023, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured and did not complain of any pain at the scene. In keeping with the fact that MR was not seriously injured, MR did not visit any hospital emergency room following the accident. To the extent that MR experienced any health issues at all

31

as the result of the accident, they were of minimal severity. Even so, on August 14, 2023, Sagman purported to conduct an initial examination of MR at Miramar Medical. To the extent that Sagman performed the examination in the first instance, he did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sagman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sagman provided MR with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither MR's presenting problems, nor the treatment plan provided to MR by Sagman presented any risk of significant complications, morbidity, or mortality. To the contrary, MR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sagman consisted of medically unnecessary chiropractic/physical therapy treatment, which did not pose the least bit of risk to MR. Even so, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sagman engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)    On December 19, 2023, an Insured named BG was involved in an automobile accident. The contemporaneous police report indicated that BG's vehicle was drivable following the accident. The police report further indicated that BG was not injured as the result of the accident. In keeping with the fact that BG was not seriously injured, BG did not visit any hospital emergency room following the accident. To the extent that BG experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on January 2, 2024, Sagman purported to conduct an initial examination of BG at Miramar Medical. To the extent that Sagman performed the examination in the first instance, he did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sagman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sagman provided BG with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither BG's presenting problems, nor the treatment plan provided to BG by Sagman presented any risk of significant complications, morbidity, or mortality. To the contrary, BG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sagman consisted of medically unnecessary chiropractic/physical therapy treatment, which did not pose the least bit of risk to BG. Even so, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sagman engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)   On February 25, 2024, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that JS's vehicle was drivable following the accident. The police report further indicated that JS was not

injured as the result of the accident. In keeping with the fact that JS was not seriously injured, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on February 27, 2024, Sagman purported to conduct an initial examination of JS at Miramar Medical. To the extent that Sagman performed the examination in the first instance, he did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sagman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sagman provided JS with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither JS's presenting problems, nor the treatment plan provided to JS by Sagman presented any risk of significant complications, morbidity, or mortality. To the contrary, JS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sagman consisted of medically unnecessary chiropractic/physical therapy treatment, which did not pose the least bit of risk to JS. Even so, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sagman engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)     On February 29, 2024, an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured and did not complain of any pain at the scene. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on March 4, 2024, Sagman purported to conduct an initial examination of JH at Miramar Medical. To the extent that Sagman performed the examination in the first instance, he did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sagman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sagman provided JH with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither JH's presenting problems, nor the treatment plan provided to JH by Sagman presented any risk of significant complications, morbidity, or mortality. To the contrary, JH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sagman consisted of medically unnecessary chiropractic/physical therapy treatment, which did not pose the least bit of risk to JH. Even so, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sagman engaged in some legitimate, medium complexity moderate decision-making during the purported examination.

33

(x)     On April 30, 2024, an Insured named JV was involved in an automobile accident. The contemporaneous police report indicated that JV's vehicle was drivable following the accident. The police report further indicated that JV was not injured as the result of the accident. In keeping with the fact that JV was not seriously injured, JV did not visit any hospital emergency room following the accident. To the extent that JV experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on May 7, 2024, Sagman purported to conduct an initial examination of JV at Miramar Medical. To the extent that Sagman performed the examination in the first instance, he did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sagman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sagman provided JV with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither JV's presenting problems, nor the treatment plan provided to JV by Sagman presented any risk of significant complications, morbidity, or mortality. To the contrary, JV did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sagman consisted of medically unnecessary chiropractic/physical therapy treatment, which did not pose the least bit of risk to JV. Even so, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sagman engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xi)    On September 9, 2024, an Insured named GC was involved in an automobile accident. The contemporaneous police report indicated that GC's vehicle was drivable following the accident. The police report further indicated that GC was not injured and did not complain of any pain at the scene. In keeping with the fact that GC was not seriously injured, GC did not visit any hospital emergency room following the accident. To the extent that GC experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on September 10, 2024, Sagman purported to conduct an initial examination of GC at Miramar Medical. To the extent that Sagman performed the examination in the first instance, he did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sagman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sagman provided GC with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither GC's presenting problems, nor the treatment plan provided to GC by Sagman presented any risk of significant complications, morbidity, or mortality. To the contrary, GC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sagman consisted of medically unnecessary chiropractic/physical therapy treatment, which did not pose the least bit of risk to GC. Even so, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sagman

34

engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xii) On October 24, 2024, an Insured named GH was involved in an automobile accident. The contemporaneous police report indicated that GH's vehicle was drivable following the accident. The police report further indicated that GH was not injured and did not complain of any pain at the scene. In keeping with the fact that GH was not seriously injured, GH did not visit any hospital emergency room following the accident. To the extent that GH experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on October 31, 2024, Sagman purported to conduct an initial examination of GH at Miramar Medical. To the extent that Sagman performed the examination in the first instance, he did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sagman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sagman provided GH with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither GH's presenting problems, nor the treatment plan provided to GH by Sagman presented any risk of significant complications, morbidity, or mortality. To the contrary, GH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sagman consisted of medically unnecessary chiropractic/physical therapy treatment, which did not pose the least bit of risk to GH. Even so, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sagman engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiii) On January 5, 2025, an Insured named KD was involved in an automobile accident. The contemporaneous police report indicated that KD's vehicle was drivable following the accident. The police report further indicated that KD was not injured as the result of the accident. In keeping with the fact that KD was not seriously injured, KD did not visit any hospital emergency room following the accident. To the extent that BG experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on January 2, 2024, Sagman purported to conduct an initial examination of KD at Miramar Medical. To the extent that Sagman performed the examination in the first instance, he did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sagman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sagman provided KD with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither KD's presenting problems, nor the treatment plan provided to KD by Sagman presented any risk of significant complications, morbidity, or mortality. To the contrary, KD did not need any significant treatment at all as a result of the accident, and the treatment plan

provided by Sagman consisted of medically unnecessary chiropractic/physical therapy treatment, which did not pose the least bit of risk to KD. Even so, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sagman engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiv)   On January 9, 2025, an Insured named SM was involved in an automobile accident. The contemporaneous police report indicated that SM's vehicle was drivable following the accident. The police report further indicated that SM was not injured and did not complain of any pain at the scene. In keeping with the fact that SM was not seriously injured, SM did not visit any hospital emergency room following the accident. To the extent that SM experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on January 14, 2025, Sagman purported to conduct an initial examination of SM at Miramar Medical. To the extent that Sagman performed the examination in the first instance, he did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sagman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sagman provided SM with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither SM's presenting problems, nor the treatment plan provided to SM by Sagman presented any risk of significant complications, morbidity, or mortality. To the contrary, SM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sagman consisted of medically unnecessary chiropractic/physical therapy treatment, which did not pose the least bit of risk to SM. Even so, Miramar Medical and Sagman billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sagman engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xv)   On February 3, 2025, an Insured named TS was involved in an automobile accident. The contemporaneous police report indicated that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain at the scene. In keeping with the fact that TS was not seriously injured, TS did not visit any hospital emergency room following the accident. To the extent that TS experienced any health issues at all as the result of the accident, they were of minimal severity. Even so, on February 25, 2025, Sagman purported to conduct an initial examination of TS at Miramar Medical. To the extent that Sagman performed the examination in the first instance, he did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sagman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sagman provided TS with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither TS's presenting problems, nor the treatment plan provided to TS by Sagman presented any risk of significant

complications, morbidity, or mortality. To the contrary, TS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sagman consisted of medically unnecessary chiropractic/physical therapy treatment, which did not pose the least bit of risk to TS. Even so, Miramar Medical billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sagman engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

112. These are only representative examples. In the claims identified in Exhibit "1", Miramar Medical and Sagman routinely falsely represented that the purported examinations involved legitimate, moderate complexity medical decision-making, when in fact they did not involve any legitimate medical decision-making at all.

113. In a legitimate clinical setting, when a patient presents with a soft tissue injury such as a sprain or strain arising from an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

114. It is generally inappropriate to begin administering physical therapy to a patient with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

115. Even so, in the claims identified in Exhibit "1", Miramar Medical and Sagman routinely caused Insureds to immediately begin a course of physical therapy, often within days of their accidents, before the Insureds had first tried a more conservative course of treatment.

116. Miramar Medical and Sagman routinely caused Insureds to immediately begin a course of physical therapy within days of their accidents because their putative initial examinations involved no legitimate medical decision-making and had pre-determined outcomes.

37

117.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

118.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

119.    As set forth herein, in the claims identified in Exhibit "1", almost all of the Insureds whom the Defendants purported to treat were involved in relatively minor accidents.

120.    It is improbable that two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially similar injuries as the result of their accidents, or require a substantially similar course of treatment.

121.    It likewise is improbable that two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, on or about the exact same date after their underlying automobile accidents.

122.    It is even more improbable – to the point of impossibility – that these kinds of patterns would recur with great frequency within the cohort of patients treating with a single practice such as Miramar Medical.

123.    Even so, and in keeping with the fact that Miramar Medical and Sagman's putative "diagnoses" were pre-determined and false, Miramar Medical and Sagman frequently purported to provide examinations – on or about the same date – to two or more Insureds who had been involved in the same underlying accident, and at the conclusion of the examinations, caused the Insureds to be issued substantially identical, false "diagnoses" and recommended substantially

identical courses of medically unnecessary "treatment" for the Insureds, despite the fact that they were differently situated.

124.   For example:

(i)   On January 28, 2020, two Insureds – MF and MF – were involved in the same automobile accident. Thereafter, both Insureds presented at Miramar Medical for initial examinations on the exact same date, January 30, 2020. MF and MF were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MF and MF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miramar Medical and Sagman caused MF and MF to be provided with substantially similar, false soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(ii)   On August 6, 2020, three Insureds – MP, RP, and AP – were involved in the same automobile accident. Thereafter, all three Insureds presented at Miramar Medical for initial examinations on the exact same date, August 6, 2020. MP, RP, and AP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MP, RP, and AP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miramar Medical and Sagman caused MP, RP, and AP to be provided with substantially similar, false soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary.

(iii)   On December 2, 2020, three Insureds – AV, LV, and NV – were involved in the same automobile accident. Thereafter, all three Insureds presented at Miramar Medical for initial examinations on the exact same date, December 8, 2020. AV, LV, and NV were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AV, LV, and NV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miramar Medical and Sagman caused AV, LV, and NV to be provided with substantially similar, false soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(iv)   On December 23, 2020, three Insureds – PP, SP, and GP – were involved in the same automobile accident. Thereafter, all three Insureds presented at Miramar Medical for initial examinations on the exact same date, January 11, 2021. PP, SP, and GP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that PP, SP, and GP suffered any injuries at all in their

39

accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miramar Medical and Sagman caused PP, SP, and GP to be provided with substantially similar, false soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(v)     On October 1, 2021, two Insureds – RD and JD – were involved in the same automobile accident. Thereafter, both Insureds presented at Miramar Medical for initial examinations on the exact same date, October 18, 2021. RD and JD were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RD and JD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miramar Medical and Sagman caused RD and JD to be provided with substantially similar, false soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(vi)    On February 7, 2021, two Insureds – DP and AP – were involved in the same automobile accident. Thereafter, both Insureds presented at Miramar Medical for initial examinations on the exact same date, February 19, 2021. DP and AP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DP and AP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miramar Medical and Sagman caused DP and AP to be provided with substantially similar, false soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(vii)   On July 21, 2021, four Insureds – LN, ND, HD, and ED – were involved in the same automobile accident. Thereafter, all four Insureds presented at Miramar Medical for initial examinations on the exact same date, July 29, 2021. LN, ND, HD, and ED were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LN, ND, HD, and ED suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miramar Medical and Sagman caused LN, ND, HD, and ED to be provided with substantially similar, false soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(viii)  On January 6, 2022, two Insureds – JO and BD – were involved in the same automobile accident. Thereafter, both Insureds presented at Miramar Medical for initial examinations on the exact same date, January 12, 2022. JO and BD were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JO and BD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miramar

40

Medical and Sagman caused JO and BD to be provided with substantially similar, false soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(ix)    On November 16, 2022, two Insureds – YS and OS – were involved in the same automobile accident. Thereafter, both Insureds presented at Miramar Medical for initial examinations on the exact same date, November 17, 2022. YS and OS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YS and OS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miramar Medical and Sagman caused YS and OS to be provided with substantially similar, false soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(x)     On December 28, 2022, two Insureds – BC and KC – were involved in the same automobile accident. Thereafter, both Insureds presented at Miramar Medical for initial examinations on the exact same date, January 3, 2023. BC and KC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that BC and KC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miramar Medical and Sagman caused BC and KC to be provided with substantially similar, false soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xi)    On February 11, 2023, three Insureds – EG, LG, and EG – were involved in the same automobile accident. Thereafter, all three Insureds presented at Miramar Medical for initial examinations on the exact same date, February 21, 2023. EG, LG, and EG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EG, LG, and EG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miramar Medical and Sagman caused EG, LG, and EG to be provided with substantially similar, false soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xii)   On February 21, 2023, two Insureds – NB and CR – were involved in the same automobile accident. Thereafter, both Insureds presented at Miramar Medical for initial examinations on the exact same date, February 23, 2023. NB and CR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that NB and CR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miramar Medical and Sagman caused NB and CR to be provided with substantially similar,

false soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xiii)   On January 29, 2024, two Insureds – MV and RV – were involved in the same automobile accident. Thereafter, both Insureds presented at Miramar Medical for initial examinations on the exact same date, January 30, 2024. MV and RV were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MV and RV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miramar Medical and Sagman caused MV and RV to be provided with substantially similar, false soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xiv)   On October 6, 2024, four Insureds – MM, IL, AM, and AM – were involved in the same automobile accident. Thereafter, all four Insureds – MM, IL, AM, and AM – presented at Miramar Medical for initial examinations on or about the exact same date, October 15, 2024 and October 16, 2024. MM, IL, AM, and AM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MM, IL, AM, and AM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miramar Medical and Sagman caused MM, IL, AM, and AM to be provided with substantially similar, false soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xv)   On January 12, 2025, two Insureds – KP and AJ – were involved in the same automobile accident. Thereafter, both Insureds presented at Miramar Medical for initial examinations on the exact same date, March 11, 2025. KP and AJ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that KP and AJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miramar Medical and Sagman caused KP and AJ to be provided with substantially similar, false soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

125.   These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", Sagman and Miramar Medical frequently caused substantially similar "diagnoses" to be issued, on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary "treatment"

42

to the Insureds, despite the fact that the Insureds were differently situated and, in any case, did not require the treatment.

126.     In the claims for initial examinations identified in Exhibit "1", Miramar Medical and Sagman routinely falsely represented that the initial examinations involved medical decision-making of moderate complexity in order to provide a false basis to bill for the initial examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations that do not require any complex medical decision-making at all.

127.     In actuality, the initial examinations did not involve any legitimate medical decision-making at all, because the purported "results" of the examinations were pre-determined, falsified, and designed to provide a false justification for the other medically unnecessary Fraudulent Services that the Defendants purported to provide.

128.     In the claims for initial examinations identified in Exhibit "1", Miramar Medical and Sagman routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii)   Miramar Medical never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it operated in violation of Florida law.

**2.     The Fraudulent and Unlawful Charges for Follow-Up Examinations at Miramar Medical**

129. In addition to their fraudulent initial examinations, Miramar Medical and Sagman often purported to subject the Insureds in the claims identified in Exhibit "1" to one or more fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

130. In the claims identified in Exhibit "1", Miramar Medical and Sagman typically billed GEICO under CPT codes 99213 and 99214 for the follow-up examinations that they purported to provide.

131. As set forth herein, the charges for the follow-up examinations identified in Exhibit "1" misrepresented the nature, extent, and results of the follow-up examinations, and also falsely represented that Miramar Medical and Sagman were operating in accordance with Florida law and were eligible to receive PIP reimbursement in the first place.

a. **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

132. Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically represents – among other things – that the patient presented with problems of low to moderate severity at the time of the examination.

133. The CPT Assistant provides various clinical examples of low to moderate severity presenting problems that would support the use of CPT code 99213 to bill for a follow-up patient examination.

(i) Follow-up visit with a 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii) Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii) Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

44

(iv)     Routine, follow-up office evaluation at three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)      Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)     Quarterly follow-up visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)    Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

134.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

135.    Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up patient examination typically represents that the patient presented with problems of moderate to high severity at the time of the examination.

136.    The CPT Assistant provides various clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)      Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)     Office evaluation of 28-year-old patient with regional enteritis, diarrhea, and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)     Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)      Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the

45

medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)    Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology / General Surgery / Internal Medicine / Family Medicine)

(viii)    Office visit with a 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

137. Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

138. By contrast, and as set forth herein, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of minimal severity, even at their onset.

139. Minor soft tissue injuries such as sprains and strains almost always resolve after a short course of conservative treatment or no treatment at all.

140. By the time the Insureds in the claims identified in Exhibit "1" presented at Miramar Medical for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their typically minor automobile accidents, or their problems were minimal.

141. Even so, in the claims for the follow-up examinations identified in Exhibit "1", when billing for putative follow-up examinations using CPT codes 99213 and 99214, Miramar Medical and Sagman falsely represented that the Insureds presented with problems of low to

moderate severity, or moderate to high severity, respectively, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

142.    In the claims for follow-up examinations under CPT codes 99213 and 99214 that are identified in Exhibit "1", Miramar Medical and Sagman routinely falsely represented that the Insureds presented with problems of either low to moderate severity (when billed under CPT code 99213) or moderate to high severity (when billed under CPT code 99214) in order to: (i) create a false basis for their charges for the examinations under CPT codes 99213 and 99214, because examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.    Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

143.    What is more, though the use of CPT codes 99213 or 99214 to bill for a follow-up examination represents that the examining practitioner took a legitimate patient history, performed an actual physical examination, and engaged in legitimate medical decision-making, in the claims for follow-up examinations identified in Exhibit "1", Sagman never took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making.

144.    Rather, Sagman simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving

their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

145.    The putative "follow-up examinations" that Miramar Medical and Sagman purported to provide to the Insureds in the claims identified in Exhibit "1" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the supposed "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Miramar Medical's office.

146.    In the claims for follow-up examinations identified in Exhibit "1", Miramar Medical and Sagman routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   Miramar Medical was never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as the clinics were unlawfully operated in violation of Florida law.

**3.    The Defendants' Fraudulent and Unlawful Claims for "Physical Therapy" and Chiropractic Services**

147.    In addition to the fraudulent and unlawful initial examinations and follow-up examinations, the Defendants typically purported to subject each of the Insureds in the claims identified in Exhibits "1" – "2" to months of medically unnecessary physical therapy and chiropractic treatment.

148. In the claims identified in Exhibit "1", Miramar Medical and Sagman typically billed the purported physical therapy and chiropractic services to GEICO under:

(i) CPT code 97010, for putative hot/cold packs, typically resulting in a charge of $35.00 for each round of hot/cold packs they purported to provide;

(ii) CPT code 97012, for putative mechanical traction, typically resulting in a charge of $40.00 for each round of mechanical traction they purported to provide;

(iii) CPT code 97035, for putative ultrasound therapy, typically resulting in a charge of $75.00 for each round of ultrasound therapy they purported to provide;

(iv) CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of $75.00 for each round of neuromuscular reeducation they purported to provide;

(v) CPT codes 98940 and 98941, for putative chiropractic manipulative treatment, typically resulting in charges between $60.00 and $90.00 for each round of chiropractic manipulative treatment they purported to provide; and

(vi) Healthcare Common Procedure Coding System ("HCPCS") code G0283 for putative electrical stimulation treatment, typically resulting in a charge for $40.00 for each round of electrical stimulation they purported to provide.

149. In the claims identified in Exhibit "2", Dorsal Rehab and Sagman typically billed the purported physical therapy and chiropractic services to GEICO under:

(i) CPT code 97110 for putative therapeutic exercises, typically resulting in a charge of $70.00 for each round of therapeutic exercises they purported to provide; and

(ii) CPT code 97140 for putative manual therapy, typically resulting in a charge of $65.00 for each round of manual therapy they purported to provide.

150. In the claims for purported physical therapy and chiropractic services identified in Exhibits "1" – "2", the charges for physical therapy and chiropractic services were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

151. In fact, and as set forth above, the Defendants never were eligible to collect PIP Benefits, because of their fraudulent and unlawful activities, including violations of the Clinic Act, No-Fault Law, Physical Therapy Act, and False and Fraudulent Insurance Claims Statute, and

49

because the purported physical therapy services had been performed – to the extent that they were performed at all – by massage therapists.

152. What is more, in a legitimate clinical setting, the individual physical therapy and chiropractic services that are provided to an individual patient should be tailored to that patient's individual circumstances and presentation.

153. In keeping with the fact that the purported physical therapy services that were billed through the Sagman Entities to GEICO were not medically necessary, the Defendants did not tailor the physical therapy and chiropractic services they purported to provide to each Insured's individual circumstances and presentation.

154. There are a large number of individual types of physical therapy and chiropractic services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

155. However, the Defendants routinely purported to provide the same handful of physical therapy and chiropractic "treatments" to the Insureds in the claims identified in Exhibits "1" – "2", on substantially the same schedule, without regard for the Insureds' individual circumstances.

156. In the claims for physical therapy and chiropractic services identified in Exhibits "1" – "2", the Defendants routinely fraudulently misrepresented that the services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i) the services were medically unnecessary, and were provided without regard for the Insureds' true individual circumstances and presentation;

(ii) the services were performed by massage therapists and unlicensed/unsupervised individuals;

(iii)     the billing for the services misrepresented the identities of the actual treating practitioners; and

(iv)     the Defendants never were eligible to collect PIP Benefits in connection with the services in the first instance, inasmuch as they operated in violation of Florida law.

**4.     The Defendants' Violations of the False and Fraudulent Insurance Claims Statute**

157.     The Defendants knew that, if they made a legitimate, good-faith effort to collect PIP deductibles from their patients, it would impede their ability to carry out the fraudulent and unlawful scheme described herein. For instance, if the Defendants made legitimate efforts to collect deductibles, Insureds would be less likely to continue presenting to Miramar Medical and Dorsal Rehab for medically unnecessary treatments.

158.     Accordingly, as part and parcel of their fraudulent and unlawful scheme, the Defendants unlawfully engaged in the general business practice of waiving – or failing to make a good-faith effort to collect – PIP deductibles from their patients, in violation of the False and Fraudulent Insurance Claims Statute.

159.     In keeping with this fact, in almost all of the thousands of bills (i.e., HCFA-1500 forms) submitted to GEICO through Miramar Medical and Dorsal Rehab for the Fraudulent Services, the Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the Insureds.

160.     In the claims identified in Exhibits "1" - "2", the Defendants routinely and falsely represented that the underlying health care services were lawfully provided and reimbursable, when, in fact, the services were neither lawfully provided nor reimbursable, because the Defendants operated in violation of the False and Fraudulent Insurance Claims Statute.

**5.     The Unlawful Operation of the Sagman Entities in Violation of the Clinic Act**

161. Miramar Medical and Doral Rehab purported to be exempt from the Clinic Act's health care clinic licensure requirements, but, in fact, operated without valid exemptions. As a result, both Miramar Medical and Doral Rehab operated as unlicensed health care clinics in violation of the Clinic Act.

162. Miramar Medical and Doral Rehab were "clinics" within the meaning of the Clinic Act, in that each was an entity "where health care services [w]ere provided to individuals and which tender[ed] charges for reimbursement for such services."

163. However, neither Miramar Medical nor Doral Rehab had clinic licenses or medical directors.

164. Instead, Miramar Medical and Doral Rehab were owned by Sagman, and both Miramar Medical and Doral Rehab purported to operate under the "wholly owned" exemption from the Clinic Act's licensing, operating, and medical director requirements.

165. However, Sagman never legitimately supervised the business activities of Miramar Medical and Doral Rehab, inasmuch as Sagman never made any attempt to remedy the fraudulent and unlawful charges submitted through Miramar Medical and Doral Rehab, and he instead caused Miramar Medical and Doral Rehab to operate in the fraudulent and unlawful manner described herein.

166. Had Sagman legitimately supervised the business activities of Miramar Medical and Doral Rehab, Sagman would not have permitted Miramar Medical and Doral Rehab to operate in the fraudulent and unlawful manner described herein.

167. Accordingly, neither Miramar Medical nor Doral Rehab ever qualified for the "wholly owned" exemption from licensure as a "health care clinic" that is set forth in the Clinic Act, or any other kind of valid exemption from the clinic licensing and medical director

52

requirements. Additionally, neither Miramar Medical nor Doral Rehab ever maintained a clinic license, and neither Miramar Medical nor Doral Rehab ever employed a licensed physician-medical director.

168.    As a result, both Miramar Medical and Doral Rehab operated – at all relevant times – in violation of the licensing and operating requirements set forth in the Clinic Act.

### III.    The Fraudulent Claims the Defendants Submitted – or Caused to be Submitted – to GEICO

169.    To support their fraudulent charges, the Defendants systematically submitted thousands of HCFA-1500 forms and treatment reports to GEICO through Miramar Medical and Dorsal Rehab – containing thousands of individual charges – seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive.

170.    The claims that the Defendants submitted – or caused to be submitted – to GEICO were false and misleading in the following, material respects:

(i)    The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Defendants were in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, they were not.

(ii)    The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, they were not.

(iii)    The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary, and in many cases, misrepresented to GEICO that the Fraudulent Services were actually performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich the Defendants, not to provide medically necessary treatment to Insureds.

(iv)    The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

171.   The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

172.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and have gone to great lengths to accomplish this concealment.

173.   For instance, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that the Defendants operated in violation of Florida law and were, therefore, ineligible to collect PIP Benefits in the first instance.

174.   The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary, and frequently were never performed in the first instance.

175.   The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services oftentimes were unlawfully performed by massage therapists and unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

176.   Miramar Medical and Dorsal Rehab operated from the same address in Miramar, Florida, and both Miramar Medical and Dorsal Rehab purported to be owned by the same chiropractor, namely Sagman.

177.   In this context, there was no legitimate reason for Sagman to simultaneously operate two separate health care practices (i.e., Miramar Medical and Dorsal Rehab), using two separate tax identification numbers, from the same address. Sagman operated his health care practice through two separate entities using two separate tax identification numbers in order to

54

reduce the volume of fraudulent and unlawful PIP billing submitted through any one entity, so as to avoid detection of, conceal, and perpetuate the Defendants' fraudulent PIP billing scheme.

178. The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers if the charges were not promptly paid in full.

179. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to – and did – cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $1,250,000.00.

180. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover – and could not reasonably have discovered – that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Miramar Medical and Dorsal Rehab**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

181. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-180, above.

182. There is an actual case in controversy between GEICO and the Sagman Entities regarding more than $75,000.00 in pending fraudulent claims for Fraudulent Services that have been submitted to GEICO.

183. The Sagman Entities have no right to receive payment for any pending bills submitted to GEICO because unlawfully was operated in violation of Florida law.

184. The Sagman Entities have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided and billed to GEICO.

185. The Sagman Entities have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

186. The Sagman Entities have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

187. The Sagman Entities have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

188. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Sagman Entities have no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Sagman
### (Violation of RICO, 18 U.S.C. § 1962(c))

189. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-180, above.

56

190. Miramar Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

191. Sagman has knowingly conducted and/or participated, directly or indirectly, in the conduct of the Miramar Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Miramar Medical was not eligible to receive under the No-Fault Law because: (i) Miramar Medical was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the levels of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

192. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "1".

193. Miramar Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Sagman operated Miramar Medical, inasmuch as Miramar Medical was not engaged in legitimate health care practice, and acts of mail fraud therefore were essential

57

in order for Miramar Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Miramar Medical to the present day.

194. Miramar Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Miramar Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

195. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $900,000.00 pursuant to the fraudulent bills submitted through Miramar Medical.

196. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Miramar Medical and Sagman**
**(Under Fla. Stat. §§ 501.201 et seq.)**

197. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-180, above.

198. Miramar Medical and Sagman are actively engaged in trade and commerce in the State of Florida.

199. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

200.     Miramar Medical and Sagman engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

201.     The bills and supporting documents submitted – or caused to be submitted – to GEICO by Miramar Medical and Sagman were fraudulent in that they misrepresented: (i) Miramar Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

202.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Miramar Medical and Sagman has been materially injurious to GEICO and its Insureds.

203.     The conduct of Miramar Medical and Sagman was the actual and proximate cause of the damages sustained by GEICO.

204.     Miramar Medical and Sagman's unfair and deceptive acts have caused GEICO to sustain damages of at least $900,000.00.

205.     By reason of Miramar Medical and Sagman's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**FOURTH CAUSE OF ACTION**
**Against Miramar Medical and Sagman**
**(Common Law Fraud)**

206.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-180, above.

207.     Miramar Medical and Sagman intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the

course of submitting – or causing to be submitted – thousands of fraudulent bills through Miramar Medical for the Fraudulent Services.

208. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Miramar Medical was in compliance with Florida law, and eligible to collect PIP Benefits in the first instance, when in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

209. Miramar Medical and Sagman intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Miramar Medical that were not reimbursable.

210. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $900,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted through Miramar Medical.

211. Miramar Medical and Sagman's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

212. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Miramar and Sagman**
**(Unjust Enrichment)**

213.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-180, above.

214.   As set forth above, Miramar Medical and Sagman have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

215.   When GEICO paid the bills and charges submitted – or caused to be submitted – by Miramar Medical and Sagman through Miramar Medical, it reasonably believed that it was legally obligated to make such payments based on Miramar Medical and Sagman's improper, unlawful, and/or unjust acts.

216.   Miramar Medical and Sagman have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Miramar Medical and Sagman voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

217.   Miramar Medical and Sagman's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

218.   By reason of the above, Miramar Medical and Sagman have been unjustly enriched in an amount to be determined at trial, but in no event less than $900,000.00.

**SIXTH CAUSE OF ACTION**
**Against Sagman**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

219.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-180, above.

220.   Dorsal Rehab is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

61

221. Sagman has knowingly conducted and/or participated, directly or indirectly, in the conduct of the Dorsal Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Dorsal Rehab was not eligible to receive under the No-Fault Law because: (i) Dorsal Rehab was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the levels of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

222. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "2".

223. Dorsal Rehab's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Sagman operated Dorsal Rehab, inasmuch as Dorsal Rehab was not engaged in legitimate health care practice, and acts of mail fraud therefore were essential in order for Dorsal Rehab to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that

Dorsal Rehab and Sagman continue to attempt collection on the fraudulent billing submitted through Dorsal Rehab to the present day.

224.    Dorsal Rehab is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Dorsal Rehab in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

225.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $350,000.00 pursuant to the fraudulent bills submitted through Dorsal Rehab.

226.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Dorsal Rehab and Sagman**
**(Under Fla. Stat. § 501.201 et. seq.)**

227.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-180, above.

228.    Dorsal Rehab and Sagman are actively engaged in trade and commerce in the State of Florida.

229.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

230.    Dorsal Rehab and Sagman engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

231.     The claims and supporting documents submitted – or caused to be submitted – to GEICO by Dorsal Rehab and Sagman were fraudulent in that they misrepresented: (i) Dorsal Rehab's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

232.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Dorsal Rehab and Sagman has been materially injurious to GEICO and its Insureds.

233.     The conduct of Dorsal Rehab and Sagman was the actual and proximate cause of the damages sustained by GEICO.

234.     Dorsal Rehab and Sagman's unfair and deceptive acts have caused GEICO to sustain damages of at least $350,000.00.

235.     By reason of Dorsal Rehab and Sagman's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees.

## EIGHTH CAUSE OF ACTION
### Against Dorsal Rehab and Sagman
### (Common Law Fraud)

236.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-180, above.

237.     Dorsal Rehab and Sagman intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent bills through Dorsal Rehab for the Fraudulent Services.

238.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Dorsal Rehab was in compliance with Florida law, and eligible to collect PIP Benefits in the first instance, when in fact Dorsal Rehab was not in compliance with Florida Law, and was eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

239.   Dorsal Rehab and Sagman intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Dorsal Rehab that were not reimbursable.

240.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $350,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted through Dorsal Rehab.

241.   Dorsal Rehab and Sagman's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

242.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against Dorsal Rehab and Sagman**
**(Unjust Enrichment)**

243.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-180, above.

244.   As set forth above, Dorsal Rehab and Sagman have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

245.   When GEICO paid the bills and charges submitted – or caused to be submitted – by Dorsal Rehab and Sagman through Dorsal Rehab, it reasonably believed that it was legally obligated to make such payments based on Dorsal Rehab and Sagman's improper, unlawful, and/or unjust acts.

246.   Dorsal Rehab and Sagman have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Dorsal Rehab and Sagman voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

247.   Dorsal Rehab and Sagman's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

248.   By reason of the above, Dorsal Rehab and Sagman have been unjustly enriched in an amount to be determined at trial, but in no event less than $350,000.00.

**JURY DEMAND**

249.   Pursuant to the Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against Miramar Medical and Dorsal Rehab, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Sagman Entities have no right to receive payment for any of the pending bills submitted to GEICO.

B.      On the Second Cause of Action against Sagman, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $900,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

C.      On the Third Cause of Action against Miramar Medical and Sagman, compensatory damages in an amount to be determined at trial but in excess of $900,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

D.      On the Fourth Cause of Action against Miramar Medical and Sagman, compensatory damages in an amount to be determined at trial but in excess of $900,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

E.      On the Fifth Cause of Action against Miramar Medical and Sagman, more than $900,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

F.      On the Sixth Cause of Action against Sagman, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $350,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

G.      On the Seventh Cause of Action against Dorsal Rehab and Sagman, compensatory damages in an amount to be determined at trial but in excess of $350,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

H.      On the Eighth Cause of Action against Dorsal Rehab and Sagman, compensatory

damages in an amount to be determined at trial but in excess of $350,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

I.       On the Ninth Cause of Action against Dorsal Rehab and Sagman, more than $350,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Dated: Jacksonville, Florida
        May 5, 2026

/s/ Max Gershenoff

Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen Wenger (FBN 92136)
Christina M. Snipas (FBN 1038951)
**RIVKIN RADLER LLP**
Riverplace Tower
1301 Riverplace Blvd.
Suite 1000
Jacksonville, Florida 32207
Phone: (904) 791-8948
Facsimile: (904) 598-6225
-and-
926 RXR Plaza
Uniondale, New York 11550
Phone: (516) 357-3000
Facsimile: (516) 357-3333
max.gershenoff@rivkin.com
john.marino@rivkin.com
lindsey.trowell@rivkin.com
kristen.wenger@rivkin.com
christina.snipas@rivkin.com
*Counsel for Plaintiffs*